**THORNHILL v. BANCROFT BAG FAC-TORY et al.***

No. 4371.

Court of Appeal of Louisiana. Second Circuit.

Dec. 16, 1932.

Oliver & Digby, of Monroe, for appellants.

J. B. Dawkins, of Monroe, for appellee.

PALMER, J.

This is a suit to recover compensation under the Employer's Liability Act (Act No. 20 of 1914 and amendments thereto). Plaintiff was employed by defendant T. O. Bancroft, operating under the trade name of Bancroft Bag Factory, as a truck driver. His duties were to load a truck with bundles of paper bags, weighing from 40 pounds to 119 pounds, manufactured by the defendant, and then drive the truck to the place where the paper bags were to be delivered and there unload them. He had been employed by the defendant about three and one-half years, during which time he performed this same character of work. Prior to his employment by defendant he worked as a truck driver for W. C. Salley.

On June 2, 1931, plaintiff, while performing his regular duties, and while driving the truck from the city of Monroe out the Sterlington Road, received the injuries producing the disability of which he complains, by the road caving from under the truck, causing it to overturn in a ditch. The Union Indemnity Company carried workmen's compensation insurance on the employees of Bancroft Bag Factory, and hence is made a party defendant in this case.

Plaintiff alleges that he was receiving, at the time of his injuries, $28 per week, but it developed that the correct amount was $25.38. He was paid 65 per cent. of his weekly wages from the time he was injured up to and including the week ending January 9, 1932, at which time further compensation was refused on the ground that he had fully recovered.

Plaintiff alleges that he was badly injured and was rendered unconscious for a short space of time; that he suffered a tearing of the muscles in his back and a rupture of the ligaments therein, as well as several bruises to his back and side and a sprain of his hip joint.

He further alleges that his said injuries have produced a total and permanent disability in him for the performance of any reasonable physical labor, which is the sole means he has for earning a livelihood, and he therefore seeks to recover 65 per cent. of his weekly wages for a period of 400 weeks, beginning at the time he received his injuries, subject to a credit for payment of all compensation due for the weeks intervening between June 2, 1931, and January 9, 1932. He also seeks to recover the maximum amount allowed by law for medical attention.

Defendants admit plaintiff's employment. They further admit that he was injured while engaged in work in the course of his employment, but they aver he was receiving weekly wages in the sum of only $25.38, which plaintiff does not contradict. In fact, there is no dispute over the question that plaintiff was entitled to compensation. The only question in controversy is the extent of plaintiff's injuries. Defendants contend that on January 9, 1932, at the time they discontinued payment of compensation, plaintiff had sufficiently recovered to resume his regular work. The lower court rendered judgment in favor of plaintiff and against the defendants in solido in the amount of 65 per cent. of plaintiff's weekly wages of $25.38, over a period of 400 weeks, less a credit for the payments made covering the weeks intervening between July 2, 1931, and January 11, 1932, with 5 per cent. per annum interest on all weekly payments past due since January 11, 1932. The judgment is silent as to plaintiff's demands for the maximum amount allowed by law for medical attention, and therefore this demand may be considered as having been rejected.

### Opinion.

If plaintiff, as a result of his said injuries, is permanently totally disabled for the performance of any reasonable physical labor, he is entitled to 65 per cent. of his weekly wages, since such payments were discontinued, during the period of disability, not to exceed a total of 400 weeks. Section 8, subsection b; Act No. 20 of 1914, as amended by Act No. 242 of 1928. Clearly, therefore, a decision in this case hinges upon the facts and the facts only.

There is a sharp conflict between the testimony of plaintiff and his witnesses on the one side and the testimony of defendants' witnesses on the other side, regarding the question of the extent of plaintiff's injuries. The physicians who testified in the case were unable to agree on the nature and extent of plaintiff's injuries. Much was said by all of them relative to objective and subjective symptoms. In the case all the physicians testifying for plaintiff say they found objective symptoms, which, with the subjective symptoms furnished by the plaintiff, constituted the basis of their testimony, while on the other hand the physicians testifying for the defendants in the main said they were unable to find any objective symptoms. We shall first, therefore, consider the testimony given by the physicians placed on the stand by plaintiff.

Dr. A. D. Tisdale examined plaintiff in September, 1931, and again examined him just before the trial, which was about six months later. He said he found the same conditions

present in both examinations. He said that plaintiff had tenderness over the right hip, and that in placing him on the table and flexing his legs there was pain produced in his hip joint, and that in abducting or throwing the leg out from the mid line of the body it produced a greater amount of pain. He said that in placing your hand over the hip joint and flexing the right leg with the other hand there was crepitation noted in the hip joint. In his opinion this crepitation was due to one or the other of two causes: (1) Arthritis, an inflammation of the hip joint; or,(2) lacerated ligaments. It was his opinion that it was lacerated or torn ligaments. He said that condition could be caused by anything that would strain the leg. Basing his opinion on his findings and the history of the case—that is, both objective and subjective symptoms— he said he thought plaintiff's disability would last as long as he lives. It was his opinion that plaintiff has a torn teres ligament, which holds the head of the femur in the articular joint, that is, the hip joint.

Dr. E. J. Young also examined plaintiff and testified concerning his injuries as follows: "Well, from physical examination and from the objective and subjective symptoms, my diagnosis would be he had a sprain of the ligaments of the hip joint and the sacroiliac joint both, with a possibility of some of the ligaments being torn. A possibility, but I would say they were sprained."

When asked to state on what he based his opinion, he said: "From the physical examination, different motions of the leg with the patient in different positions; and from the subjective symptoms, pain on different motions and from different joints; pain from the sacroiliac joint and pain from the hip joint; and tenderness also."

Dr. Young says if plaintiff has what he (Dr. Young) thinks he has, in his opinion he is totally disabled to do heavy work. Both Drs. Tisdale and Young said that an X-ray would not reveal a torn or sprained ligament. In fact, the doctors for the defendants also said the same thing.

Defendant placed three physicians on the stand. We shall consider their testimony in the order in which they gave it. Dr. M. B. Pierce, who examined plaintiff several times, said he was unable to find any objective symptoms of the injuries from which plaintiff claims he suffers. He said that you would get objective symptoms if plaintiff has a torn ligament in the hip joint or if he has a sacroiliac sprain; that plaintiff, when he first came to him for treatment, submitted subjective symptoms showing a sacroiliac sprain, and he then disclosed certain objective symptoms which he said such a condition would necessarily produce. He said none of these symptoms were present in plaintiff. He thought plaintiff had fully recovered.

When plaintiff was first injured, he was carried to the St. Francis Sanitarium in Monroe, where he came under the treatment of Dr. A. H. McHenry, who said X-ray pictures of plaintiff's back, spine, and sacroiliac joint, with which injuries plaintiff had quite a bit of trouble, were made, but that there appeared to be no bone injury to his back. He said, however, that plaintiff seemed to be rather severely hurt and complained a good deal of pain while in the hospital; that his back seemed to give him a great deal of trouble all during the time he was in the hospital; that he probably had a sprain in the sacroiliac joint, in which testimony he differed with Dr. Pierce in that particular. Dr. McHenry was then asked: "How about the ligaments of the bone joint?" He answered: "I don't think he has any ligament involvement. But that is hard to say whether he had or not. I don't think so."

He said that plaintiff wanted to try to work, and he agreed for him to try it about three months after the injury, and that he had not seen him since that time and therefore did not know his condition at the time of the trial. Dr. McHenry said he treated plaintiff on a previous occasion for trouble to his back, but plaintiff denied that the previous treatment given him by Dr. McHenry was to his back, but stated that it was an injury to his shoulder. When Dr. McHenry gave his testimony regarding his previous treatment of plaintiff, he was asked on cross-examination if he would not examine his records to see if he was not in error on that point. He agreed that he would make such an examination, but he never came back on the stand to report the result of it.

Dr. W. L. Bendell, who with Dr. Pierce treated plaintiff after he had made an effort to go back to work on his old job and found he could not do the work, also examined plaintiff a number of times; the first being in November after the injury in the early part of June. He said plaintiff, when he came to him for treatment, complained of his back and hip, but that there were no objective findings except a limp resulting from his efforts to protect his right side; that he found that plaintiff possibly had a disturbance on the right side in the form of a sacroiliac sprain. In that particular part of his testimony he went further than Dr. Pierce, who said no objective symptoms were present showing such a sprain. Dr. Bendell further said that he ordered a belt for plaintiff to meet that situation. He said that he examined plaintiff the day before the trial and found his back was not giving him any more trouble, but said when plaintiff stooped completely over he had a little difficulty in arising; that he did complain of his hip, which was still giving him trouble; that he concluded that plaintiff could not have a great deal of trouble in his hip; and that he considered that he was then in good condition.

Thus we find one set of medical witnesses expressing their belief that the extent of plaintiff's injuries reaches permanent total disability, while another set believes that his injuries were rather slight and that he has already recovered from them. If, on a matter of such vital importance involving expert medical knowledge, high-class, capable, and reputable physicians have such differences of opinion, how much more difficult is it for a court of judges to determine a state of facts involving a man's physical condition? The witnesses who testified to the total permanent disability of the plaintiff said that in addition to the subjective symptoms they also found objective symptoms on which to base their conclusion, while the physicians who stated that the injuries were more or less slight and that he has fully recovered said that they found no objective symptoms whatever. It would seem, however, that if the subjective symptoms revealed plaintiff's true condition, then all the doctors would agree that his injuries are such as would render him totally unable to perform hard manual labor.

If it is true that plaintiff's condition is not such as renders him totally disabled from performing hard manual labor, then at least two of the physicians who testified are mistaken in their findings of certain objective symptoms, and, furthermore, plaintiff himself would clearly be a malingerer, unworthy of belief. The ability and standing of all the physicians who testified in the case is unquestionably of the highest character. Therefore it is pertinent to a decision in this case to consider the character of man plaintiff is. Is he the type of man that would likely malinger? Does he appear to be a man who objects to work, so much so that he would rather receive 65 cents doing nothing than work and receive $1?

Plaintiff testified that he is not able to perform any physical labor; that he cannot lean over and lift anything of weight; that he cannot drive a car because he does not have the strength to push in the brake or clutch; that he still suffers pain; that he does not think he is any better than he was sixty days after receiving his injuries. His wife, Mrs. Thornhill, testified that her husband suffers a great deal with his hip and back; that he has great difficulty in sleeping at night and that he does not rest well, but often has to get up on account of his back; that he seems to suffer as much as he did a month or two after the accident. Both plaintiff and his wife testified that the limp plaintiff has is a result of his said injuries.

T. O. Bancroft, one of the defendants, testified that plaintiff worked for him three and one-half years just prior to his injuries and was always "a very steady employee." He said that by agreement between the insurance company through Dr. McHenry, their physician and their local adjuster, plaintiff and himself, that plaintiff went back to work to see if he was able to hold down his job as a truck driver; that to make this effort on the part of plaintiff possible, he (Bancroft) agreed to place a helper on the truck to do the lifting in loading and unloading so it would not be necessary for plaintiff to lift anything; that if it was found that plaintiff could not do the work, at the end of thirty or sixay days he was to be again put on compensation; that after trying the work for sixty days plaintiff found he was no better and that the exercise he was getting from driving the truck was harmful; so the insurance company thereupon resumed paying him compensation.

Dr. McHenry, the insurance company's doctor, who had first treated plaintiff after his injuries, said it was plaintiff who proposed that he be given an opportunity to again try to drive the truck in the hope that the exercise would improve his condition.

If the lay testimony is to be believed, plaintiff is not a malingerer. On the contrary, he appeared anxious to improve his condition so he could resume his regular work. He asked for a chance to exercise by driving again or trying to drive. The opportunity was accorded him by his employer, but it only served to show he was not able to perform the work necessary to hold his job, notwithstanding plaintiff's employer, who seemed friendly to his move, furnished an extra hand to do the lifting which plaintiff usually did as a part of his regular work.

If plaintiff's employer, who is one of the defendants in this case, and the insurance company's doctor, say plaintiff requested a chance to see if he could do the work of his old job, it seems that such is testimony of such a high character as to negative any idea whatever that plaintiff is malingering.

Inasmuch as the opinions of the medical experts concerning the extent of plaintiff's injuries so vastly differed, we think in this case the testimony of the lay witnesses should be given unusual weight in determining the issue involved. From that testimony we are convinced that plaintiff is still incapacitated to do hard physical work, the only kind he seems capable of performing. Certainly we see no manifest error in the findings of fact by the trial court.

Therefore the judgment appealed from is affirmed, defendants, appellants, to pay all costs of appeal.